# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Tsegaye Takele, Ph.D.,                                       Civil No. 06-1530 (DWF/SRN)

                Plaintiff,

v.                                                          **MEMORANDUM
                                                            OPINION AND ORDER**

The Mayo Clinic,

                Defendant.

---

Scott W. Carlson, Esq., and Troy J. Hutchinson, Esq., Heins Mills & Olson, PLC; and Douglas Micko, Esq., Sprenger & Lang, counsel for Plaintiff.

Robert L. Hobbins, Esq., Kevin A. Finnerty, Esq., Ryan E. Mick, Esq., Dorsey & Whitney LLP; and Sharon C. Zehe, Esq., Mayo Clinic, counsel for Defendant.

---

# INTRODUCTION

Plaintiff Tsegaye Takele brought suit against The Mayo Clinic ("Mayo") alleging discrimination on the basis of race and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII") and 42 U.S.C. § 1981, retaliation, and defamation. The matter is currently before the Court on Mayo's Motion for Summary Judgment and Motion to Exclude the Opinions of Dr. John Hall. For the reasons stated below, the Court grants Mayo's Motion for Summary Judgment.[1]

---

[1]     The disposition of Mayo's motion to exclude the opinions of Dr. John Hall does not affect the outcome of Mayo's motion for summary judgment. Because the Court

(Footnote Continued on Next Page)

**BACKGROUND**

The Mayo Graduate School of Medicine (the "Graduate School") has a Medical Physics Residency Program ("Residency Program"). (Aff. of Michael G. Herman, Ph.D. ("Herman Aff.") ¶ 8.) The Residency Program trains candidates to practice in the field of clinical medical physics. Clinical medical physics is a specialty in the field of Radiation Oncology, which is an area of medical practice that uses high doses of ionizing radiation as part of cancer treatment. The Residency Program is a two-year program with eight clinical rotations. (*Id*. ¶¶ 8, 18.)

Plaintiff, who is Ethiopian, applied for admission to the Residency Program in November 2002.[2] (*Id*. ¶ 13, Ex. 4.) Plaintiff interviewed with several Residency Program faculty members. He was extended, and accepted, an offer of admission to the Residency Program. (*Id*. ¶ 13.) The faculty members involved in the admissions decision were Dr. Michael G. Herman, Ph.D., Program Director for the Residency Program from January 2003 to January 2007; Dr. Edwin McCollough, predecessor to Dr. Herman as Program Director[3]; Dr. Robert Kline; and Dr. Jon Kruse. (*Id*.) Plaintiff received a letter dated April 16, 2002, from an associate dean at Mayo, informing Plaintiff that the Graduate Education Committee approved his appointment to the Clinical

---

(Footnote Continued From Previous Page)
grants Mayo's motion for summary judgment, the Court denies without prejudice Mayo's motion to exclude as moot.

[2]     On his application, Plaintiff identified his race as "African American/Black" and that his country of citizenship was Ethiopia. (Herman Aff., ¶ 13, Ex. 4.)

[3]     Dr. McCollough retired after Plaintiff began his residency.

Medical Physics program.  The letter explained that "[c]ontinuation and completion of

the program are dependent upon satisfactory progress in education, performance of all

duties, and compliance with Mayo Graduate School of Medicine Policies."  (*Id.* ¶ 14, Ex.

6.)  One such policy is that "[a] grade of 'C' or lower results in the immediate evaluation

of a resident's progress.  Your performance is an important factor in determining your

future assignments and opportunities for greater responsibility.  Continued unsatisfactory

performance will likely result in probation and/or termination."  (*Id.* ¶ 14, Ex. 7.)

Plaintiff began the Residency Program on July 2, 2003.  (*Id.* ¶ 15.)  Plaintiff's first

rotation was in Dosimetric Systems.  Dosimetric Systems involves the theory, function,

clinical application, and quality control of radiation detection equipment used in radiation

treatments.  The objective of the Dosimetric Systems rotation is to "equip the resident to

understand and to utilize properly various radiation measurement devices, including ion

chambers, diodes and film, which are utilized in the clinical practice of radiation

oncology."  (Aff. of Jon J. Kruse, Ph.D ("Kruse Aff.") ¶ 4.)

A few months into his residency, faculty members expressed concern about

Plaintiff's progress.  In particular, on October 15, 2003, the Medical Physics Residency

Executive Committee (the "Committee"), which is made up of faculty of the Residency

Program, met and discussed the performance of its residents.  The minutes of the

October 15 meeting read:

> [Plaintiff's] progress was reviewed.  We discussed whether [Plaintiff] is
> understanding what he is doing.  It appears that most of the time he does,
> but at times seems nearly clueless.  This is partly communication and
> experience we believe and need to make sure he is getting the picture.

(Herman Aff. ¶ 19, Ex. 8.)  In December 2003, Plaintiff was assigned a grade of "C" for his first-quarter performance.  (*Id.* ¶ 19, Ex. 10.)  The statement on the grade report reads: "[Plaintiff] is off to a slow start in his residency.  We have reviewed this and the expectations for improvement.  He is highly motivated and we expect quite capable of getting on track."  (*Id.*)  Plaintiff completed a written report for the Dosimetric Systems rotation in mid-December.  The faculty's evaluation of Plaintiff's written report and corresponding oral presentation reads:

> In general, the written report is inadequate in that explanatory text does not accompany the data.  That is, tables of data and figures are included with little or no description of the measurement(s) and no thoughtful conclusive analysis of the data.
>
> When instructed on techniques and procedures [Plaintiff] must be more alert and retentative, . . . .
>
> On several topics [Plaintiff] could not remember/repeat information that had been discussed with him at length, . . . .
>
> [Plaintiff] needs to accept criticism/advice and learn rather than argue.

(Kruse Aff. ¶ 9, Ex. 2.)

Sometime following the receipt of Plaintiff's first-quarter grade, Dr. Herman met with Plaintiff to discuss Plaintiff's progress.  Dr. Herman also arranged to supervise Plaintiff on a film dosimetry project.  Plaintiff received a "B" for his second quarter grade.  (Herman Aff. ¶ 20, Ex. 10.)  The comments on this grade report read:  "[Plaintiff] has demonstrated real improvement in effort and understanding.  We want to see this continue."  (*Id.*)

As his residency continued, the Residency Program faculty received input from various medical professionals (such as dosimetrists, medical physicists, and trainers) on Plaintiff's performance and competency. Much of this input raised concerns about Plaintiff's grasp on basic dosimetry concepts and competency to perform clinical functions. (Herman Aff. ¶ 23, Ex. 11; Aff. of Ryan E. Mick ("Mick Aff.") ¶ 11, Ex. 10 (Dep. of Kevin Kisrow) at 24:18-25:15); Mick Aff. ¶ 12, Ex. 11 (Dep. of Jeff Kuball) at 28:9-24.) In addition, faculty observed that Plaintiff misunderstood fundamental concepts. (Aff. of Debra H. Brinkmann, Ph.D. ("Brinkmann Aff") ¶¶ 4, 6 (commenting on second rotation, External Beam Dosimetric Treatment Planning); Herman Aff. ¶ 23, Ex. 11.) In February 2004, the Committee again discussed Plaintiff's progress. The minutes from that meeting read:

> We discussed the issues with [Plaintiff's] slow learning and sometimes apparent lack of comprehension. He needs to step up his requests for help. Make sure he asks and that we confirm in our discussions with him, that he is learning and understands what we have discussed. We need to assess this carefully to see if probation is necessary. [Dr. Herman] had a frank discussion with [Plaintiff] on this subject. [Dr. Herman] agreed to supervise a film dosimetry project on electron small field measurements to test [Plaintiff's] knowledge of using detectors in the clinic. This is currently underway.

(Herman Aff. ¶ 24, Ex. 12.)

In April 2004, the Residency Program faculty decided to place Plaintiff on probation. The faculty members involved in the decision included Dr. Herman, Dr. Kline, and Dr. Kruse. (*Id*. ¶ 25.) The minutes from the April 28, 2004, Committee meeting read in part:

> [Plaintiff] seems to be working hard.  However, his progress is painfully slow.  In numerous cases, it appears that he understands something, only to find out some simple aspect of his understanding is completely off/wrong.  Each of the faculty have experienced this with [Plaintiff].  He really has not fully completed his first rotation even now after nearly 10 months (nearly 50% of the entire residency period).  His work on the film dosimetry, although having moments of what appeared to be clear progress and comprehension were dimmed by the fact that he made mistakes that were so basic . . . that this faculty group is deeply concerned. . . . We will now proceed with probation for approximately a 3 month period . . . .

(*Id.* ¶ 25, Ex. 13.)  In a memorandum to Plaintiff dated May 3, 2004, Dr. Herman explained that Plaintiff was placed on probationary status for academic deficiency and explained that the action was unanimously approved by the Committee in April.  The faculty also prepared an "action plan [to] be followed in hopes of getting [Plaintiff] on track to completing the program successfully."  (*Id.* ¶ 26, Ex. 14 at 2.)  The plan provided, among other things, for an oral evaluation near the end of the probationary period to assess Plaintiff's progress and to determine a final action.

During the probationary period, faculty members and others reported continued problems with Plaintiff's performance.  (*Id.* ¶¶ 29-30, 33, Exs. 15, 16, 21; Brinkmann Aff., ¶¶ 7, 12, Ex. 3.)  Faculty and others noted multiple errors in performing basic processes and tests and a lack of comprehension of basic medical physics concepts.  In July 2004, Plaintiff was to complete five different dosimetric treatment plans independently; the evaluations of three of these plans revealed problems in Plaintiff's performance.  (Herman Aff. ¶ 34, Ex. 22; Aff. of Troy J. Hutchinson in Opp. to Def.'s Mot. for Summ. J. ("Hutchinson Aff.") ¶25, Ex. 24.)  The faculty also received input from all of the trainers who worked with Plaintiff during probation.  Again, this input

revealed problems with Plaintiff's understanding of basic concepts.  (Herman Aff. ¶ 35, Exs. 24, 26.)

On August 3, 2004, Plaintiff took his oral evaluation.  (Hutchinson Aff. ¶ 25, Ex. 24.)  Notes from that meeting reveal that the faculty believed Plaintiff continued to fail to grasp basic concepts and noted numerous other performance issues.  (*Id*.)  Following Plaintiff's oral evaluation, the faculty unanimously concluded that Plaintiff should be given the opportunity to resign, or if he declined, that he should be dismissed from the Residency Program.  (Herman Aff. ¶ 37, Ex. 28.)  Plaintiff was informed of the faculty's decision on August 9, 2004.  (*Id*. ¶ 38, Ex. 29.)  Plaintiff decided not to resign, and, instead, appealed the decision to the Dean of the Graduate School.  On August 14, 2004, Plaintiff submitted an appeal.  (Aff. of Roger L. Nelson, M.D. ("Nelson Aff.") ¶ 5.)  A committee to review the appeal was assembled.  (*Id*. ¶ 6.)  Plaintiff submitted a memorandum and supporting documents and presented his case to the committee in person.  Plaintiff did not claim that he had been discriminated or retaliated against based on race or national origin.  (*Id*. ¶ 8.)  The members of the committee voted unanimously to deny Plaintiff's appeal and to confirm the decision to dismiss Plaintiff.  (*Id.* ¶ 10.)  Plaintiff was informed of the decision on appeal in a letter dated September 8, 2004.  (*Id*. ¶ 11, Ex. 3.)  In addition, Plaintiff was informed that he would remain on paid administrative leave through October 8, 2004.  (*Id*.)  Plaintiff filed a charge of

discrimination with the Equal Employment Opportunity Commission ("EEOC") on

July 28, 2005.  (Mick. Aff. ¶ 2, Ex. 1.)[4]

## DISCUSSION

## I.      Motion for Summary Judgment

### A.      Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and

the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The

Court must view the evidence and the inferences that may be reasonably drawn from the

evidence in the light most favorable to the nonmoving party.  *Enter. Bank v. Magna Bank

of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  However, as the Supreme Court has stated,

"[s]ummary judgment procedure is properly regarded not as a disfavored procedural

shortcut, but rather as an integral part of the Federal Rules as a whole, which are

designed 'to secure the just, speedy, and inexpensive determination of every action.'"

*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of

material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank*, 92 F.3d

at 747.  The nonmoving party must demonstrate the existence of specific facts in the

record that create a genuine issue for trial.  *Krenik v. County of Le Sueur*, 47 F.3d 953,

957 (8th Cir. 1995).  A party opposing a properly supported motion for summary

judgment may not rest upon mere allegations or denials but must set forth specific facts

---

[4]      Both parties refer to the EEOC filing date as July 26, 2005.  However, the correct
date appears to be July 28, 2005.  (Mick. Aff. ¶ 2, Ex. 1.)

showing that there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

B.      *Statute of Limitations*

Mayo argues that it is entitled to summary judgment on Plaintiff's Title VII claim because it is time-barred.  The parties agree that Plaintiff had 300 days after the alleged unlawful employment practice occurred to file his Title VII charge of discrimination with the EEOC.  42 U.S.C. § 2000e-5(e)(1).  Plaintiff filed a charge of discrimination with the EEOC on July 28, 2005. (Mick. Aff. ¶ 2, Ex. 1.)

The parties disagree on when the statute of limitations began to run.  Mayo argues that either the day Plaintiff was informed of his dismissal from the Residency Program (August 10, 2004)[5] or the day Plaintiff was informed that the Graduate School affirmed his dismissal (September 8, 2004) triggered the statutory period.  Mayo further argues that because both of those dates were more than 300 days before Plaintiff filed his charge with the EEOC, his Title VII claim is time-barred.  Plaintiff, on the other hand, argues that he was not terminated from Mayo until at least October 8, 2004 (the day his paid administrative leave ended), and therefore his EEOC charge was timely filed.  Plaintiff also argues that if the Court determines that his claims are time-barred, his claims should be subject to equitable tolling.

---

[5]      The record reveals that Plaintiff actually acknowledged receipt of the faculty's decision on August 9, 2004.  (Herman Aff. ¶ 38, Ex. 29.)

In the context of a Title VII case, the statue of limitations begins to run when the allegedly unlawful act is communicated to the plaintiff. *See Delaware State College v. Ricks*, 449 U.S. 250, 258-59 (1980). *See also Dring v McDonnell Douglas Corp.*, 58 F.3d 1323, 1328 (8th Cir. 1995) (ADEA). Although Plaintiff was informed that he would remain on paid administrative leave through October 8, 2004, the record is clear that Plaintiff's dismissal (the allegedly unlawful act) was communicated to Plaintiff no later than September 8, 2004. Thus, Plaintiff's cause of action accrued no later than September 8, 2004. Counting forward, July 5, 2005, constitutes the 300th and final day for Plaintiff to file with the EEOC. Because Plaintiff did not file his EEOC complaint until July 28, 2005, his Title VII claim is time-barred.[6]

Plaintiff also argues that his Title VII claim is subject to equitable tolling. The administrative filing period is subject to waiver, estoppel, and equitable tolling. *See Anderson v. Unisys Corp.*, 47 F.3d 302, 305-06 (8th Cir. 1995). "[E]quitable tolling is premised on plaintiff's excusable neglect, which may or may not be attributable to the defendant." *Id.* Here, Plaintiff claims that he was consistently told by the EEOC that the date of adverse action was October 8, 2004, and that that date started the 300-day limitations period. (Aff. of Dr. Tsegaye Takele, Ph.D. ("Plaintiff Aff.") ¶ 30.) The Court concludes that Plaintiff has raised a factual issue as to whether he received inaccurate

---

[6]    Plaintiff mentions that he filed his Intake Questionnaire with the EEOC on July 20, 2005. To the extent that Plaintiff attempts to argue that the questionnaire constitutes a charge, the Court notes that Plaintiff's case is still time-barred, as the questionnaire was filed after July 5, 2005.

information from the EEOC and whether such information warrants equitable tolling.

Thus, the Court addresses the merits of Plaintiff's Title VII claim.

C.     *Discrimination under Title VII and 42 U.S.C. § 1981*

Plaintiff alleges that he was discriminated against on the basis of his race and

national origin in violation of Title VII and 42 U.S.C. § 1981.[7]  Mayo argues that both

claims fail as a matter of law.

Plaintiff claims to have direct evidence of discrimination.  Specifically, he points

to an e-mail sent to certain Mayo faculty members dated August 11, 2004, from Susan

Ahlquist.[8]  The email reads:

> The resident from Medical Physics, [Plaintiff], is thinking seriously of
> appealing his dismissal for academic deficiency. . . .  His visa status, which
> will be converted to a B2 Visitor Visa at the time of dismissal will not
> change until the appeal process is complete.  If you decide to uphold the
> program decision, Roger, you will need to notify the IPO that you have
> declined the appeal, and give and [sic] date, which also becomes his H1
> Visa end date.  Should [Plaintiff] raise the issue of possible discrimination .
> . . Mary Ellen made the good point that the EEOC ruling for discrimination
> may not apply in the same way . . . .

(Hutchinson Aff. ¶ 27, Ex. 26.)  Plaintiff argues that this e-mail demonstrates direct

evidence of discrimination.  In particular, Plaintiff argues that race and national origin

entered into the decision to terminate him because the ultimate decision-makers at Mayo

were aware of Plaintiff's race and national origin.  The Court disagrees.  Direct evidence

---

[7]     The elements and analysis of a discrimination claim under Title VII and § 1981
are the same.  *Saulsberry v. St. Mary's Univ. of Minn.*, 318 F.3d 862, 866 (8th Cir. 2003).

[8]     Ms. Ahlquist is an Administrator in the Mayo School of Graduate Medical
Education and acted as an ombudsperson for Plaintiff when he was placed on probation.
(Aff. of Susan L. Ahlquist ("Ahlquist Aff.") ¶ 1.)

is that which demonstrates a specific link between the challenged employment action and the alleged discriminatory animus.  *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 934 (8th Cir. 2006).  While the e-mail mentions Plaintiff's immigration status, it does not reflect a discriminatory attitude.  In addition, it was not made by a decision-maker on appeal and was sent *after* the initial decision to dismiss Plaintiff.  Therefore, the e-mail does not demonstrate a specific link between Plaintiff's termination and the alleged racial animus.

Because Plaintiff does not present direct evidence of discrimination, the Court analyzes his claims under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Riser v. Target Corp.*, 458 F.3d 817, 819 (8th Cir. 2006).  Under *McDonnell Douglas*, Plaintiff must first establish a prima facie case of racial discrimination.  If Plaintiff is able to establish a *prima facie* case of discrimination, the burden shifts to Mayo to produce a legitimate, non-discriminatory reason for the adverse employment action.  *Id*. at 820.  If Mayo is able to articulate such a reason, the burden then shifts back to Plaintiff to show that the proffered reason is a pretext for discrimination.  *Id*.

To establish a *prima facie* case of race or national origin discrimination, Plaintiff must demonstrate that:  (1) he is a member of a protected group; (2) he was qualified for the residency; (3) he suffered an adverse employment action; and (4) circumstances exist which create an inference of discrimination.  *Id*. at 819-20.  The fourth element can be met by demonstrating that similarly situated employees were treated differently.  *Wheeler v. Aventis Pharms.*, 360 F.3d 853, 857-58 (8th Cir. 2004).  Here, Plaintiff can establish that he was a member of a protected class and was dismissed from the Residency

Program.  The parties disagree, however, about whether Plaintiff has established that he was qualified for the Residency Program and that similarly situated residents were treated differently.

### 1.    Qualified for the Residency Program

Mayo asserts Plaintiff was not qualified to continue his participation in the Residency Program.  Plaintiff, on the other hand, asserts that he met the minimum qualifications for the Residency Program.  To meet his burden, Plaintiff must demonstrate that he was actually performing his job at a level that met Mayo's legitimate expectations.  *Box v. Principi*, 442 F.3d 692, 696 (8th Cir. 2006); *Whitley v. Peer Review Sys., Inc.*, 221 F.3d 1053, 1055 (8th Cir. 2000).  The fact that an employee meets some expectations does not mean that employee meets the standard if he also fails to meet other significant expectations.  *Calder v. TCI Cablevision of Mo., Inc.*, 298 F.3d 723, 729 (8th Cir. 2002).

To establish that he was qualified for the Residency Program, Plaintiff points to the fact that he was accepted into the highly-competitive program and evidence of certain successes during his residency.  For example, Plaintiff submits evidence that he achieved most or all expectations in a bile duct treatment plan, three prostate treatment plans, and an esophagus plan.  (Hutchinson Aff. ¶¶ 5, 6, 7, Exs. 4, 5, 6.)  Mayo, on the other hand, has pointed to evidence that Plaintiff had significant performance problems as a resident and that the Residency Program faculty unanimously decided that Plaintiff was not qualified to continue as a resident.  The record is replete with evidence of Plaintiff's poor performance and of Mayo's concerns with respect to Plaintiff's progress.

13

Viewing the record in the light most favorable to Plaintiff, the Court concludes that no reasonable juror could conclude that Plaintiff was qualified to continue his residency at Mayo.

### 2.    *Similarly situated individuals treated differently*

To establish a prima facie case, Plaintiff must also demonstrate circumstances that give rise to an inference of discrimination. *Riser*, 458 F.3d at 819-20; *Wheeler*, 360 F.3d at 857. Plaintiff attempts to do so by showing that a similarly situated resident was treated differently. At the *prima facie* stage, there is a "low threshold" standard for determining whether employees are similarly situated. *Rodgers v. U.S. Bank*, 417 F.3d 845, 852 (8th Cir. 2005). Under this standard, the similarly situated employee must have been involved in or accused of the same or similar conduct but treated differently. *Rodgers*, 417 F.3d at 852.

Plaintiff contends that he was similarly situated to Dr. Christopher Hagness. Dr. Hagness, who is Caucasian, was in the Residency Program from Fall 2002 to Fall 2004. (Hutchinson Aff. ¶ 39, Ex. 38 (Dep. of Michael G. Herman ("Herman Dep.")) at 25.) Plaintiff was in the same program from July 2003 until his termination. Both were required to complete the same rotations, the first being Dosimteric Systems. (*Id*. at 29.)

Plaintiff asserts that he and Dr. Hagness exhibited similar performance issues during their respective residencies, yet Dr. Hagness was treated better than Plaintiff. In particular, Plaintiff asserts that Plaintiff was given a "C" on his first rotation and later placed on probation for slow progress, and that he was ultimately dismissed for failing to work independently. Plaintiff also claims that he was learning and making progress at a

faster pace than Dr. Hagness, yet Dr. Hagness never received a "C" grade and was never placed on probation or dismissed.

Plaintiff claims that he finished his first rotation more quickly than Dr. Hagness. In making this claim, Plaintiff relies primarily on the deposition testimony of Dr. Herman, wherein Dr. Herman testified that it took Dr. Hagness eleven months to compete his first rotation. (Herman Dep. at 66.) Dr. Herman, however, submitted a supplemental affidavit indicating that he was not referring to Dr. Hagness' Dosimetric Systems rotation, but instead was referring to a different, subsequent rotation for which Dr. Herman was a primary reader. (Supp. Aff. of Michael G. Herman, Ph.D. ("Supp. Herman Aff.") ¶ 7.) Mayo has submitted documentary evidence demonstrating that the rotation to which Dr. Herman was referring at his deposition was Dr. Hagness' first rotation in external beam treatment planning, not the Dosimetric Systems rotation. (*Id*.) Further, Mayo has submitted evidence that Dr. Hagness began the Dosimetric Systems rotation in December 2002 and completed the rotation at the end of January 2003. (*Id*. ¶¶ 4, 7, Ex. 3.)

Even if Plaintiff could raise factual issues on the issue of how long it took Dr. Hagness and Plaintiff, respectively, to complete their first rotations, there are additional significant differences between Plaintiff and Dr. Hagness that make them improper comparators. Most significantly, there is abundant evidence in the record demonstrating that, aside from the pace at which Plaintiff progressed through his first rotation, Plaintiff struggled. (Kruse Aff. ¶ 5.) Mayo documented numerous problems with Plaintiff's performance and progress. Many of these problems called into question

Plaintiff's grasp on fundamental concepts of medical physics and many occurred during

Plaintiff's first rotation in Dosimetric Systems and his second rotation in External Beam

Dosimetric Treatment Planning.  Plaintiff has failed to demonstrate that Dr. Hagness

exhibited similar problems in grasping basic concepts during his rotation through

Dosimetric Systems or other early rotations.

Plaintiff also argues that he was ultimately dismissed for failing to perform

treatment plans independently and that evidence demonstrates that Dr. Hagness had

problems working independently, but was not dismissed.  Plaintiff points to comments on

a rotation review for Dr. Hagness, where his supervisor notes that Dr. Hagness has not

had "enough exposure to the procedures to allow him to perform independently" in his

Brachytherapy rotation.  (Hutchinson Aff. ¶ 18, Ex. 17.)  The Brachytherapy rotation,

however, involved a more advanced technology than external beam radiation treatments

and is ordinarily reserved for the later stages of the Residency Program.  Because of the

advanced nature of the Brachytherapy rotation, it is improper to compare any criticisms

of Dr. Hagness on this rotation with criticisms of Plaintiff on Plaintiff's early rotations.

In addition, the Court reiterates that evidence in the record demonstrates that the faculty

were concerned with Plaintiff's understanding of basic concepts.  There is no showing

that the faculty had similar concerns about Dr. Hagness.  Looking at the record as a

whole, Dr. Hagness did not receive nearly as many negative evaluations or comments

calling into question his understanding of basic medical physics concepts.[9]  Because of the significant differences between Plaintiff and Dr. Hagness, the Court concludes that Plaintiff has failed to establish that he and Dr. Hagness were similarly situated. Therefore, Plaintiff fails to establish a prima facie case of discrimination.

3.   *Non-discriminatory reason and pretext*

Even if Plaintiff had established a prima facie case of discrimination, Mayo has offered a legitimate, nondiscriminatory reason for the actions it took with respect to Plaintiff's residency.  Specifically, Mayo contends that it dismissed Plaintiff because of performance deficiencies and the Residency Program faculty's concerns for patient safety.  Therefore, the presumption of discrimination disappears and Plaintiff can avoid summary judgment only if the evidence demonstrates that Mayo's proffered reasons are a pretext for racial discrimination.  *See Johnson v. AT&T Corp.*, 422 F.3d 756, 762 (8th Cir. 2005).

Plaintiff attempts to show pretext with evidence that Mayo treated other residents, Dr. Hagness in particular, more favorably than him.  The test for determining if one is "similarly situated" at the pretext stage is "rigorous."  *Wheeler*, 360 F.3d at 858.  For the reasons discussed above in the Court's analysis of Plaintiff's prima facie case, Plaintiff cannot demonstrate that he was similarly situated to Dr. Hagness.

---

[9]      Plaintiff argues that negative evaluations submitted after he was placed on probation should not be considered as evidence of his poor performance because they constituted "papering" of his files.  This argument lacks merit.  First, the record reveals that Plaintiff received numerous negative comments and reviews prior to being placed on probation.  Second, there is simply no evidence that the evaluations made during his probationary period were motivated by racial animus.

Plaintiff makes additional arguments to support his claim that race or national origin was a factor in Mayo's decision to dismiss Plaintiff.  The Court addresses each in turn.

Plaintiff points to the comments of Dr. Herman and Dr. Kline when they allegedly made a joke about Plaintiff that compared his writing of a treatment plan to a thousand monkeys writing the Bible.  Plaintiff asserts that this joke was an insult to him as a Christian and a black man.  For purposes of this motion, the Court assumes that the comment was made.  *See* Fed. R. Civ. P. 56.  The Court concludes that this comment fails to demonstrate pretext or raise an inference of discrimination.  While the joke might be insulting to Plaintiff's intelligence, it does not suggest any racial bias.  To infer a discriminatory motive would require speculation.

Plaintiff asserts that on the second day of his residency, his mentor, Dr. Kline, was rude and asked him not to wear the type of clothing that he was wearing.  In his deposition, however, Plaintiff explained that Dr. Kline had told him that he did not have to wear a suit and a tie.  (Supp. Aff. of Ryan E. Mick in Supp. of Def.'s Mot. for Summ. J. ("Supp. Mick Aff.") ¶ 6, Ex. 5 (Dep. of Dr. Tsegaye Takele ("Plaintiff Dep.")) at 22:4-23.)  When asked how such a statement was discriminatory, Plaintiff explained that the statement was made in a demeaning way.  The Court concludes that this comment fails to demonstrate pretext or to create a reasonable inference of discrimination.  There is simply no indication that the comment had any racial connotation.

Plaintiff points to additional evidence to support his argument that he was treated differently because of his race or national origin.  For example, he asserts that (1)

Dr. Kline mocked Plaintiff's accent when he asked him "what are you mumbling?;"
(2) Dr. Kline made a comment ("Here comes another stupid"), implying all international
students are stupid; (3) faculty members questioned him about the war in Iraq and his
home country and assumed he had knowledge of the United Nation's weapons inspection
programs; and (4) Mayo faculty were cold and unpleasant towards him.  No reasonable
juror could conclude that any of these comments or actions suggest discriminatory
animus without resorting to speculation.  Therefore, none of these conclusory allegations
demonstrate pretext or create an inference of discriminatory intent.

Finally, Plaintiff relies on the resignation of another international resident to show
discriminatory intent.  The record demonstrates that Dr. Varun Seghal was placed on
probation and later resigned from the Residency Program.  (Herman Aff. ¶ 13, Ex.5.)
Plaintiff, however, points to no evidence that Dr. Seghal's ethnicity or race played a role
in his departure.

The Court concludes that Plaintiff has pointed to no evidence that would support a
finding of pretext or discriminatory motive.  Further, Mayo has submitted evidence to the
contrary.  For example, three of the four faculty members who voted to dismiss Plaintiff
also participated in the decision to accept him into the Residency Program.
Dr. McCollough, who participated in the decision to accept Plaintiff, retired after Plaintiff
began his residency.  Plaintiff has not pointed to any evidence in the record suggesting
that Dr. McCollough's lack of involvement in the decision to dismiss Plaintiff
demonstrates pretext or discriminatory motive.  In addition, Plaintiff's own statements
belie his claims of discrimination.  In particular, during the appeal of his dismissal and

when he filed a charge with the EEOC, Plaintiff claimed that the true reason for his dismissal was his superior physics and mathematics background, not racial or national origin discrimination.  (Takele Dep. at 190:8-191:5; 194:21-195:8; Nelson Aff. ¶ 5, Ex. 2; Mick Aff. ¶ 3, Ex. 2.)

Because Plaintiff has failed to present any material evidence calling into question Mayo's proffered reasons for dismissing Plaintiff, the Court concludes that Plaintiff's discrimination claims fails as a matter of law.  The Court grants Mayo's motion for summary judgment as to Plaintiff's Title VII and § 1981 claims.

D.      *Retaliation*

Plaintiff also asserts that Mayo retaliated against him after he complained to his ombudsperson of alleged discrimination after he was placed on probation.  In order to establish a prima facie case of retaliation, Plaintiff must demonstrate that (1) he engaged in statutorily-protected conduct; (2) Mayo took adverse employment action against him; and (3) a causal connection exists between the two.  *Wells v. SCI Mgmt., L.P.,* 469 F.3d 697, 702 (8th Cir. 2006); *Kasper v. Federated Mutual Ins. Co.*, 425 F.3d 496, 502 (8th Cir. 2005).  If Plaintiff establishes a prima facie case, the burden of production shifts to Mayo to show a legitimate, nondiscriminatory reason for its action.  *Kasper*, 425 F.3d at 502.  Then, Plaintiff must establish that the proffered nondiscriminatory reason was a pretext for discrimination.  *Id.*

Mayo argues that Plaintiff cannot establish the first or third elements.  Turning to the first element, Mayo argues that Plaintiff did not engage in statutorily protected activity because Plaintiff never raised the issue of discrimination to his ombudsperson.

Plaintiff, however, points to evidence that he asserts creates a factual issue as to whether

he raised the issue of racial discrimination to an ombudsperson.  (Hutchinson Aff. ¶¶ 41,

Ex. 40 (Dep. of LeTesha Montgomery ("Montgomery Dep.")) at 33-34, 35; ¶ 44, Ex. 43.)

Mayo also argues that there is no causal link between Plaintiff's dismissal and his

complaints to the ombudsperson.  In an effort to demonstrate causation, Plaintiff argues

that shortly after his complaints, Dr. Herman began to "paper" his file.  This argument is

speculative at best.  There is no evidence that Plaintiff's ultimate dismissal was connected

to his complaint to the ombudsperson.  And even assuming that Plaintiff had established

a prima facie case of retaliation, for the reasons discussed above, Plaintiff has provided

no evidence that Mayo's reasons for dismissing Plaintiff were a pretext for illegal

retaliation.  Indeed, Mayo was concerned about Plaintiff's performance deficiencies and

began to take action with respect to its concerns long before Plaintiff's conversations

with the ombudsperson.  The Court concludes that Plaintiff's retaliation claim fails as a

matter of law.

> ### E. *Defamation*

Plaintiff asserts a claim against Mayo for defamation based on an e-mail sent by

Dr. Herman to an official at Washington University.  The official had inquired about

Plaintiff after receiving an application from Plaintiff.  The e-mail, dated January 5, 2005,

reads as follows:

> Thanks for the contact,
>
> He was dismissed after failing probation and it got very ugly.  I wouldn't
> touch him.  The School of Graduate Medical Education has a letter in his
> file that they are allowed to give to anyone who asks for it.  I wrote it and

its [sic] as clear as it can be without defaming his character.  Other contacts
of mine have suggested that he has been represented by a recruiter as a
Mayo trained clinical physicist (frightening!).  (I think [Plaintiff's]
termination was in my annual CAMPEP report submitted to AAPM HQ a
while ago.  If you want to talk about it we can do so by phone.  Yes too bad
our batting record is crappy with a couple of these guys.  Since we got
accreditation, the application quality is way up and we are interviewing 8
people for 2 slots in the next few weeks.  Mike

(Hutchinson Aff. ¶ 35, Ex. 34.)  In addition, Plaintiff takes issue with a September 30,

2004, letter from Dr. Herman which states in part that "As [Plaintiff] worked through his

first rotation, his progress was slower than we expected."  (Herman Aff. ¶ 42, Ex. 30.)

The elements of a defamation claim include proof that the alleged statements were

made, that the statements were communicated to one other than the plaintiff, that the

statements were false, and that, as a result, the plaintiff's reputation was harmed.  *Ferrell*

*v. Cross*, 557 N.W.2d 560, 565 (Minn. 1997). True statements are not actionable as

defamation.  *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn. 1980).  To

establish a prima facie case of defamation, Plaintiff must identify an objectively false

statement of fact.

Here, Plaintiff identifies four allegedly defamatory statements.  First, Plaintiff

claims that the statement regarding Plaintiff's slow progress is defamatory.  The Court

disagrees.  Mayo puts forth evidence that a common complaint about Plaintiff's

performance was the time it took him to complete his first rotation.  Plaintiff points to no

record evidence demonstrating that the pace of his progress met Mayo's expectations.

Thus, Plaintiff cannot demonstrate that this statement is objectively false.

Next, Plaintiff argues that Dr. Herman's statements "it got very ugly"; that it was "frightening" that a recruiter stated that Plaintiff had been trained at Mayo; and that "he wouldn't touch him" are defamatory.  The Court concludes that these statements cannot support Plaintiff's defamation claim.  Instead, these statements reflect Dr. Herman's personal evaluation of Plaintiff's performance as a resident made in response to a specific inquiry by an official at Washington University.  Plaintiff cannot demonstrate that they are objectively false statements of fact.  Accordingly, Plaintiff's defamation claim fails.

## CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that:

1.      Mayo's Motion for Summary Judgment (Doc. No. 45) is **GRANTED**.

2.      Mayo's Motion to Exclude (Doc. No. 42) is **DENIED WITHOUT PREJUDICE** as moot.

3.      Plaintiff's Second Amended Complaint (Doc. No. 15) is **DISMISSED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  March 28, 2008                    s/Donovan W. Frank
                                          DONOVAN W. FRANK
                                          Judge of United States District Court